IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| JOHN M. SHORES and | * | CHAPTER 7 |
| AMY D. SHORES, | * | |
|     Debtors | * | |
| | * | CASE NO. 1:09-bk-08905MDF |
| ROBERTA A. DeANGELIS, | * | |
| UNITED STATES TRUSTEE, | * | |
|     Movant | * | |
| | * | |
|     v. | * | |
| | * | |
| JOHN M. SHORES and | * | |
| AMY D. SHORES, | * | |
|     Respondents | * | |

## OPINION

The United States Trustee (the "UST") filed a Motion to Dismiss the bankruptcy petition of John and Amy Shores ("Debtors") alleging that the totality of their financial circumstances demonstrates an abuse of Chapter 7 under 11 U.S.C. § 707(b)(3). For the reasons discussed below, I conclude that granting Debtors relief under Chapter 7 would be an abuse of the provisions of the chapter.

### I. Factual Findings

On the date Debtors filed their bankruptcy petition, John Shores ("John") had been employed for approximately two months as a "Senior Program Manager" at General Dynamics Corporation ("GDC"). Prior to being hired by GDC, he had been employed by EMC Corporation ("EMC"). John lost his job at EMC in June 2009 and had been unemployed for two months when he was hired by GDC. At the time of the hearing, the average net monthly income he received from GDC was $8041. John also was receiving a monthly pension of $1704 from the U.S. Army. Considering both sources, John's average net monthly income was $9745 on the hearing

date. Amy Shores ("Amy") is a writer, but she was unemployed and earning no income when this motion was heard.

Debtors' two children, both adult daughters, reside in Debtors' home. John testified that his oldest daughter, Bethany, is "bi-polar" and is receiving medical treatment for this condition. (N.T. 27). He said that she is not working and is unable to maintain employment. The younger child, Katherine, is married and gave birth to a child in July 2010. Katherine's husband and child also reside in Debtors' home. Katherine's husband is a full time college student who works part-time delivering pizzas. Katherine is not employed.

Debtors currently reside in Stafford County, Virginia, about forty miles south of Washington, DC. In January 2010, Debtors relocated to Virginia from York County, Pennsylvania in order to be closer to John's place of employment in Fairfax, Virginia. John testified that he was unable to obtain suitable employment in York County and that the only employment opportunities comparable to his position with EMC were in the Washington area.

Debtors are leasing their home in Virginia at $2200 a month. The residence consists of about 3200 square feet of living space containing four-bedrooms, two and one-half bathrooms, formal living and dining rooms, and a family room. Debtors specifically chose a home of this size because they were housing five adults at the time they relocated.[1] Their York County home was smaller (about 2700 square feet), but contained a similar number of rooms. Debtors attempted to find housing closer to John's workplace, but they were unable to find an affordable home to rent that would accommodate five adults.

---

[1] They began renting the home in November 2009. Debtors did not testify as to whether, at that time, they knew that Katherine was pregnant.

2

Debtors expend a significant portion of their net monthly income for utilities. Heating and cooling expenses average of $476 per month ($241 per month for natural gas and $235 per month for electricity). Water and sewer expenses are approximately $42 per month.[2] Debtors' telephone bill is listed on schedule J at $300 per month, which includes wireless service for John's Blackberry, Amy's cellular telephone, and $10 per month for Katherine's cellular telephone. John testified that his employer requires him to carry a Blackberry and to have internet access at home. Debtors' cable and internet service is listed at $220 per month for a service package that does not include any "premium channels." In the aggregate, Debtors' utility bills total $1,038 per month.

Debtors own four motor vehicles, one of which was repossessed pre-petition. The remaining vehicles include a Mitsubishi Endeavor, a Subaru Forester and a Toyota Prius. Debtors purchased the Mitsubishi primarily for Katherine's use. Debtors make the monthly payments of $300 on the Mitsubishi[3] and also pay the insurance premiums, which average $40 per month. John commutes to his workplace using his car in combination with the Metro. He

---

[2] The UST offered as evidence Debtors' monthly statements for water and sewer service for the three-month period between December 14, 2009 and March 22, 2010. The charge for three months of service was $125.54 or a monthly average of $41.51. Debtors offered a self-drafted "Utility Summary" that reflects a nine-month average expenditure of $31 for water and sewer services. To render my decision in this case, I will use the amounts calculated by the UST.

[3] The amended schedule J filed by Debtors on May 7, 2010 lists a car payment of $413 per month for "Daughter's car." It also lists two other car payments in the amounts of $301 and $465 respectively, but it does not indicate which amount is for the Subaru and which is for the Toyota. At trial, John denied that the payment on Katherine's car is $413 per month, but insisted that it is $300 per month. Debtors did not file a subsequent amendment to schedule J to conform it to John's testimony. Nonetheless, Debtors will be given the benefit of the doubt regarding the amount of the payment for purposes of this Opinion. In her motion, the UST does not challenge the reasonableness of Debtors' monthly payments on the Toyota and Subaru.

3

estimates his commuting costs to be $350 per month. On schedule J, Debtors list their monthly transportation costs at $900. This amount includes gas for and maintenance of the vehicle used by Katherine and her husband. It also includes the expense of two to three trips a week from the Virginia residence to Katherine's physician in York, Pennsylvania, which no longer is necessary since the birth of Debtors' grandchild in July 2010.

Debtors' health-care related expenses include a payment of $225 per month for health insurance for Katherine and $120 per month for Bethany's medication. Debtors also pay $172 per month for a supplemental insurance policy covering catastrophic illnesses. According to John, the primary benefit of this policy is that it will pay for travel and lodging costs for one spouse in the event that the other spouse is hospitalized for treatment of a serious illness.

Debtors filed their Chapter 7 petition on November 16, 2009. The UST filed her motion to dismiss the petition on June 7, 2010. The matter was tried August 2, 2010 and is ready for decision.[4]

## II. Discussion

Section 707(b) of title 11 requires a bankruptcy court to dismiss a Chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if granting relief would constitute an abuse of the Chapter 7 process. Under § 707(b)(2), the bankruptcy court must presume that granting relief under Chapter 7 will constitute an abuse of the chapter if a debtor's "current monthly income" exceeds allowable expenses in a sufficient amount to enable a debtor to pay a

---

[4] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

4

specified amount of debt over a sixty-month period. This mathematical calculation is referred to as the "means test" and is performed by completing Form B22A. When the presumption of abuse does not arise under § 707(b)(2), a case may be dismissed if the court determines that the petition was filed in bad faith or that "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C.A. § 707(b)(3). If a debtor does not pass the means test it "simply means that the debtor's petition is not *presumed* abusive." *Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161 (7th Cir. 2008). A petition also may be dismissed based on the totality of the circumstances, including consideration of a debtor's actual income and expenses. *Id.* at 1162. A debtor's future income and expenses are relevant as well as their financial condition on the petition date. *In re Lipford*, 397 B.R. 320, 328 (Bankr. M.D. N.C. 2008); *In re Pennington*, 348 B.R. 647, 651 (Bankr. D. Del. 2006).

A debtor's reported expenses are not accepted without question, they must be reasonable in light of a debtor's financial circumstances. Debtors must be prepared to do some "financial belt tightening and may be required to forgo amenities to which they had been accustomed." *In re McClellan*, 428 B.R. 737, 744 (Bankr. N.D. Ohio 2009) (citing *In re Krohn*, 886 F.2d 123, 128 (6th Cir.1989)) (considering "substantial abuse" under former § 707(b) of the Bankruptcy Code). However, debtors are not "expected to live in poverty to pass scrutiny in an action brought to dismiss under § 707(b)(3)." *In re McClellan*, 428 B.R. at 744 (citing *In re Fulbright*, 319 B.R. 650, 658 (Bankr. D. Mont. 2005)) (other citations omitted).)

Reviewing a debtor's budget to determine whether expenses are "excessive or unreasonable is an unenviable task." *In re Johnson*, 241 B.R. 394, 398 (Bankr. E.D. Tex. 1999), *cited in In re Roppo* ___ B.R. ___, 2010 WL 3602473 (Bankr. N.D. Ill. Sept. 16, 2010).

5

Generally, a bankruptcy court should not substitute its values for those of the debtor. However, there are exceptions. A court should question a debtor's judgment when: "(1) the debtor proposes to use income for luxury goods or services; (2) the debtor proposes to commit a clearly excessive amount to non-luxury goods or services; (3) the debtor proposes to retain a clearly excessive amount of income for discretionary purposes; (4) the debtor proposes expenditures that would not be made but for a desire to avoid payments to unsecured creditors; and (5) the debtor's proposed expenditures as a whole appear to be deliberately inflated and unreasonable." *Id* at *5 (citing *In re Navarro*, 83 B.R. 348, 355 (Bankr. E.D. Pa. 1988) (determining disposable income under § 1325(b)).

In a case under § 707(b)(3), the UST bears the burden of proving by a preponderance of the evidence that the filing of the petition constitutes abuse in the totality of the circumstances. *In re Hoffman*, 413 B.R. 191, 194 (Bankr. M.D. Pa. 2008) (citations omitted).[5]  In the totality of the circumstances of a given case, dismissal may be warranted on the sole basis that a debtor has the means to repay his debts, but a § 707(b) "dismissal is not mandated on this factor alone." *In re Hoffman*, 413 B.R. at 195.  Section 707(b)(3) is not a second opportunity to conduct the means test liberated from the test's deference to secured debt. A debtor's ability to repay debt must analyzed in the context of his total financial circumstances.

This Court analyzes the totality of the circumstances by examining the following eleven factors that numerous courts have applied to cases under §707(b)(3):

(1) whether the bankruptcy petition was filed because of sudden illness, calamity,

---

[5]The UST has the burden to establish that the totality of the circumstances of a debtor's financial situation demonstrates abuse. Once a prima facie case is established, the burden of going forward to rebut the prima facie case shifts to the debtor. *Id.*

disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith; (6) whether the debtor engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities.

*Id.* 413 B.R. at 194 (citing *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1988) (other citations omitted)).[6]

    A.    *Application of the* Krohn *factors*

        (1)    *Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment.*

Debtors assert that their petition was filed because John became unemployed. While it is true that John experienced a short period of unemployment, the impact of the job loss was softened through a "transition package" provided by his former employer. John testified that Debtors never went a month without a paycheck and that the benefits received during the transition were "similar" to his pay from EMC.

The totality of the evidence indicates that Debtors' petition was filed primarily because they chose to move their entire extended household to Virginia when John accepted a new job. The move was justified based upon the location of John's new employer; however, Debtors' decision to continue to support their adult children and son-in-law rather than repay their

---

[6]Considering the difficulty of negotiating with multiple creditors outside of bankruptcy, this Court has not found factors (9) and (10) to be particularly helpful in its analysis of the totality of the circumstances under § 707(b)(3) in most cases. Therefore, these factors will not be considered in this Opinion.

creditors is the event that precipitated their bankruptcy filing. As I will discuss below, Debtors are able to repay their creditors through a Chapter 13 plan if they unburdened themselves of the expenses associated with housing and supporting two non-dependent adults. Therefore, although I find that John's unemployment was a factor in their decision to file for bankruptcy, other factors were more significant.

>    *(2)    Whether Debtors made consumer purchases far in excess of their ability to repay*

Debtors' amended schedule F shows unsecured, nonpriority debt totaling $83,350 – all of which is attributed to credit card purchases or other consumer spending, except for student loan debt of $7374. According to Debtors' schedules, the reported unsecured debt was incurred between April 2005 to September 2009. Although a few purchases were made on the eve of bankruptcy, there is nothing in the record to suggest that Debtors made purchases in excess of their ability to repay.

>    *(3)    Whether Debtors' proposed family budget is excessive or unreasonable*

Debtors' proposed family budget is excessive or unreasonable in a number of respects. I have repeatedly followed the logic of numerous courts holding that in the absence of extraordinary circumstances, creditors should not be forced to subsidize a debtor's decision to provide food, clothing, housing and other necessities to persons whom he has no duty to support. "Payments to or for the benefit of persons whom a debtor is not required to support are not considered reasonable and necessary expenses." *In re Ramsay*, at *5 (citing *In re Miller*, 302 B.R. 495, 502 (Bankr. M.D. Pa.) (other citations omitted).[7] Thus, to the extent that Debtors

---

[7]John testified credibly that his oldest daughter is unable to live independently or otherwise support herself. He further testified that, because of his income, she is ineligible for

8

have acquired housing sufficient to accommodate five adults, rather than three, Debtors' budget for housing is unreasonable. Similarly, Debtors' utility expenses and food and clothing allowances are inflated because expenses attributable to Katherine and her family are included in Debtors' budget. Debtors' payment of the following specific expenses are also unreasonable and unnecessary: $225 per month for Katherine's health insurance; $300 per month for Katherine's vehicle; $40 per month for insuring Katherine's vehicle; and $10 per month for Katherine's cellular telephone service.

As to expenditures made only for themselves, Debtors' supplemental health insurance of $172 per month is unnecessary.[8]

> (4) *Whether Debtors' schedules and statements of current income and expenditures reasonably and accurately reflect their true financial condition*

Debtors' amended schedule I states that John's average net monthly income from his employment at GDC is $7857. I am unable to recreate the calculation through which Debtors arrived at this figure. GDC pays John on a bi-weekly basis. Each year, he receives twenty-six paychecks in a net amount of $3711. Twenty-six paychecks of $3711 received over twelve months produces an average monthly income of $8041 ($3711 × 26 ÷ 12). At trial, Debtors

---

benefits available to persons with severe and persistent mental disorders. While I am skeptical of the accuracy of this testimony, the UST did not offer evidence to rebut these representations and did not specifically contest expenditures on her behalf.

[8] John's testimony indicated that Debtors obtain adequate health insurance coverage through John's employment at GDC. His description of the additional benefits provided by the supplemental policy, e.g. payment of travel and lodging expenses for the patient's spouse, and his admission that the primary benefit of this coverage is Debtors' "peace of mind" confirm that the expense is unreasonable under the circumstances.

9

challenged this calculation by asserting that they do not actually receive $8,041 each month. While they are correct that in some months they receive more income than in others, this observation does not rebut the arithmetical evidence that their average monthly income is $8041. Thus, Debtors' schedule I, which reported their monthly income based upon receipt of two bi-weekly pay checks, under-reported their average net monthly income from GDC by $184 a month.

At trial, the UST introduced a number of invoices from various utilities whose products and services Debtors used in and around the date of their bankruptcy filing. Debtors did not dispute the accuracy of the amounts included in these invoices, which support the UST's assertion that Debtors' expenses as listed on schedule J are inflated. Debtors reported that they spend $600 per month for electricity, when the bills entered in evidence indicate that their actual expenses are $477 per month. Debtors also reported that their water and sewer expenses were $200 per month, while the bills they received demonstrated that their average bill is $70 per month. When the excess sums claimed as expenditures ($253) are added to the amount by which Debtors under-reported their income ($184), Debtors have additional monthly disposable income of $437. Therefore, in these three instances, Debtors failed to accurately report their income and expenditures.

> *(5) & (6)*  *Whether the bankruptcy petition was filed in bad faith; and whether the debtor engaged in eve of bankruptcy purchases*

The UST concedes that no evidence has been adduced in support of dismissing the case based on these factors.

10

> *(7)     Whether the debtor enjoys a stable source of future income*

John testified that GDC employs him as a "Program Manager" for a team of approximately thirty information technology specialists providing services under a contract between GDC and the United States Department of Commerce. The contract is due to expire on February 3, 2011. John does not know whether it will be renewed or not. If it is not renewed, GDC may attempt to place him in another position within the company. The UST characterizes this as an at-will employment situation equivalent to that of millions of other at-will employees in the country. I disagree. Debtor is not an at-will employee. He works under a contract with a termination date. Accordingly, this factor favors Debtors in the totality of the circumstances.

> *(8)     Whether he is eligible for adjustment of his debts through Chapter 13*

Debtors are eligible for Chapter 13 bankruptcy relief.

> *(9)     Whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities*

There are several categories in which Debtors' expenses can be reduced without depriving them of life's necessities. As discussed above, Debtors' monthly housing expenses are excessive to the extent that they are maintaining a home for their daughter Katherine and her husband and child. Unfortunately, the record lacks any hard data from the real estate market in Debtors' locale to determine what rental properties are available. The UST has suggested that the Local Housing and Utilities Expenses Standards ("housing allowance") available under the Internal Revenue Service Collection Financial Standards ("IRS Standards") for a family of three in Stafford County, Virginia ($1504) is the appropriate amount that Debtors should budget for rental expenses. Debtors' current monthly rent of $2200 is 46% more than the IRS housing allowance.

11

Case 1:09-bk-08905-MDF    Doc 64    Filed 12/08/10    Entered 12/09/10 13:38:28    Desc
Main Document    Page 11 of 14

When a housing payment is too high, a more reasonable amount will be used to calculate whether a debtor has disposable income available that could be committed to funding a Chapter 13 plan. *See, e.g., In re Welch*, 344 B.R. 50, 55 (Bankr. M.D. Pa. 2005) (debtors expected to reduce $2712 mortgage payment where applicable IRS standard for debtors was $918); *In re Hoffman*, 413 B.R. at 197 (debtor compelled to reduce $2338 monthly housing expense where applicable IRS standard was $983); *In re MacNamara*, 2009 WL 1606985, at *4 (debtors who were paying more than 30% of their income on housing and whose monthly payments were more than four times greater than applicable IRS Standard could be expected to find suitable rental housing). In the within case the amount of rent actually paid by Debtors, while higher than the housing allowance for a three-person family, is not exorbitant, considering Debtors live in close proximity to Washington, D.C.

In this case, the UST has not carried her burden to establish that the IRS housing standard is the appropriate amount that Debtors should be allowed for rent. The IRS standard does not consider that housing may be more expensive in neighborhoods closer to the nation's capital than in more remote areas. If Debtors lived further from John's place of employment in order to obtain less expensive housing there would be concomitant increases in transportation costs. Therefore, without further evidence about the cost of obtaining a suitable rental unit within commuting distance of John's place of employment, I do not find their housing expenses to be excessive.

The amounts Debtors have budgeted for utility expenses can be reduced because their actual expenses are significantly lower. As discussed above, the Debtors' estimate of their monthly heating and electric bills exceeded their actual expense by $123 and their estimate of

water and sewer charges exceeded the actual figure by $130. Therefore, their heating expense can be reduced from $600 to $477 and their water expense can be reduced from $200 to $70.

Debtors' food expense of $1700 per month is based on feeding a household of five adults. Because the UST has not opposed including Bethany in Debtors' household, it is appropriate to calculate their reasonable food budget at three-fifths of the budgeted amount or $1020.

Debtors are paying various expenses incurred by their adult daughter Katherine, which is not justified under the circumstances. It is not reasonable or necessary for Debtors to pay $340 a month in car payments and insurance for the vehicle she drives, to pay $225 a month for her health insurance, or to pay $10 per month for her cell phone.

I also find that Debtors failed to justify their payment of $172 per month for their supplemental health insurance.

  B.  *Debtors' ability to repay their debts*

The UST asserts that if Debtors' expenses were reduced to a reasonable level, they could repay a significant amount of their unsecured debt; therefore, their petition constitutes an abuse of Chapter 7. I agree. Even without any adjustments to their spending, Debtors report on their amended schedule J that they have $213.17 in monthly net income. As noted above, however, Debtors' calculation of their monthly income was less than actually received in an amount of $184 per month. Therefore, with this adjustment alone, Debtors have monthly net income of $397.17. Further, when expenses attributable to the support of Katherine and her family are eliminated, adjustments are made to reflect actual utilities costs, and Debtors' supplemental insurance is eliminated, Debtors' expenses can be reduced significantly by the amounts set forth in the categories below:

13

|  |  |
|---|---|
| Utilities | $ 123 (heat) |
|  | $ 130 (water) |
| Food | $ 680 |
| Katherine's car payment and insurance | $ 340 |
| Katherine's health insurance | $ 225 |
| Katherine's cell phone | $  10 |
| Debtors' supplemental health insurance | $ 172 |
| **Total expense reduction** | **$1680** |

Therefore, when unreasonable or excessive expenses totaling $1680 are eliminated, Debtors expenses should approximate $7281. With monthly income of $9745, Debtors have more than $2000 a month available to satisfy the claims of their creditors.

Debtors' amended schedule F shows unsecured debt totaling $83,350. If Debtors eliminated their unreasonable and unnecessary expenses and converted their case to Chapter 13 they would have sufficient disposable income to pay 100% of their unsecured claims.

### III. Conclusion

In examining the totality of the circumstances of Debtors' financial situation, the Court finds that the *Krohn* factors support a finding of abuse. First, Debtors' budget is excessive, particularly expenses related to Debtors' adult daughter Katherine and her family. Second, Debtors are able to reduce their expenditures while adequately providing for their needs and the needs of their daughter Bethany. Although John's employment after the end of his contract is not certain, other factors in this case demand dismissal. Therefore, unless Debtors choose to convert to Chapter 13, the within case will be dismissed.

By the Court,

*Mary D. France*
Chief Bankruptcy Judge

Date: December 8, 2010

14

Case 1:09-bk-08905-MDF    Doc 64    Filed 12/08/10    Entered 12/09/10 13:38:28    Desc
Main Document    Page 14 of 14